**OCEAN ACCIDENT & GUARANTEE CORPORATION, Ltd., Plaintiff-Appellant,**

v.

**ACONOMY ERECTORS, Inc., and Roy J. Green, Administrator of the Estate of John A. Green, Deceased, Defendants-Appellees.**

**No. 11382.**

United States Court of Appeals Seventh Circuit.

June 21, 1955.

R. C. Vogel, R. B. Johnstone, L. H. Vogel, Chicago, Ill., for appellant.

Elmer C. Tobin, Elgin, Ill., Byron M. Getzoff, Chicago, Ill., for appellees.

Before FINNEGAN, SWAIN and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

From a summary judgment[1] entered in the district court on the motion of defendant, Aconomy Erectors, Inc. (herein referred to as "Aconomy"), dismissing plaintiff's complaint for declaratory judgment,[2] plaintiff appeals.

The complaint alleged, *inter alia*, that on or about August 11, 1953 plaintiff issued its liability insurance policy, naming Aconomy as the insured.

Pertinent provisions of the policy include the following:

1. Rules of Civil Procedure for United States District Courts No. 56, 28 U.S. C.A.

2. 28 U.S.C.A. § 2201.

## DECLARATIONS

**Item 1.** Name of Insured    ACONOMY ERECTORS, INC.    ......................................

Address    R.#4,  Box 42,            Barrington,            Lake,            Illinois
(No.)                    Street        Town            County            State)

The business of the named insured is    Contractor    ......................................

**Item 2.** Policy Period: From    August 11,        1953 at 12:01 A.M., to    August 11,        1954
at 12:01 A.M., standard time at the address of the named insured as stated herein.

**Item 3.** The insurance afforded is only with respect to such and so many of the following coverages as are indicated by specific premium charge or charges. The limit of the company's liability against each such coverage shall be as stated herein, subject to all of the terms of this policy having reference thereto.

| COVERAGES | LIMITS OF LIABILITY | | Advance Min. Prems. | Advance Premiums | Total Advance Prems. |
|---|---|---|---|---|---|
| A—Bodily Injury Liability | $ 100,000<br>$ 300,000<br>$ | Each Person<br>Each Accident<br>Aggregate Products | $ 19.25 | $ 30.80 | |
| B—Property Damage Liability | $  20,000<br>$  25,000<br>$  25,000<br>$<br>$  25,000 | Each Accident<br>Aggregate Operations<br>Aggregate Protective<br>Aggregate Products<br>Aggregate Contractual | $ 13.90 | $ 30.60 | $ 72.58 |
| Special Coverage  Unknown Hazard (799) | Coverage A<br>Coverage B | | $  7.70<br>$  3.48 | $  7.70<br>$  3.48 | |

Premium is payable:  On effective date of Policy $        , 1st Anniversary $        , 2nd Anniversary $

| Item 4. DESCRIPTION OF HAZARDS | Code No. | Premium Bases | RATES | | Advance Premiums | |
|---|---|---|---|---|---|---|
| | | | Coverage A | Coverage B | Coverage A | Coverage B |
| (a) Premises—Operations. Specify (a) Locations of all premises owned, rented or controlled by named insured, (b) Part occupied by named insured, (c) Interest ("Owner", "General Lessee" or "Tenant") of named insured in such premises.<br>Barrington, Illinois and elsewhere in the State of Illinois<br><br>Reinforcing Concrete Work rated as: Concrete Construction—Not Otherwise Classified—including foundations, making, setting up or taking down forms, scaffolds, falsework or concrete distributing apparatus— (excavation, pile driving and all work in sewers, tunnels, subways, caissons or coffer dams to be separately rated)                  9/3- | 5213 | (a) Area (sq Ft.)<br>(b) Frontage<br>(c) Remun-<br>  eration<br><br><br><br><br><br><br><br><br><br><br><br>(c)<br>10,000. | (a) Per 100 Sq. Ft.<br>  of Area<br>(b) Per Linear Foot<br>(c) Per $100 Re-<br>  muneration<br><br><br><br><br><br><br><br><br><br>(c)<br>.308 | (c)<br>.306 | 30.80 | 30.60 |
| (b) Elevators<br>  Location and Classification of Elevators | | Number Insured | Per Elevator | | | |
| (c) Independent Contractors Let or Sublet Work | | Cost | Per $100 of Cost | | | |
| (d) Products (Including Completed Operations)<br><br>None Covered Hereunder | | Sales | Per $1000 of Sales | | | |
| (e) Contractual<br>Specify identification and date of each Agreement | | Number Insured | Per Contract | | | |

**Item 5.** The foregoing discloses all hazards insured hereunder known to exist at the effective date of this policy, except as herein stated:

No Exceptions                                                    12

Title or Number of and on a demand to check this policy at time of issuance.

31676–Amendment of Policy #1—31419A–Overtime Remuneration #2
Policy Form 310559—Ed. June, 1948—Use Application Form 311558—Ed June, 1948.

31400A–Excl. of Property Damage End. #3—31278A–Illinois Liquor End. #4            **5504 V.**
31398B–Exclusion of Products Hazard #5

\*   \*   \*   \*   \*   \*

### Insuring Agreements

I. Coverage A—Bodily Injury Liability

To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person and caused by accident.

Coverage B—Property Damage Liability

To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident.

II. Defense, Settlement, Supplementary Payments

As respects the insurance afforded by the other terms of this policy the company shall:

(a) defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient;

(b) pay all premiums on bonds to release attachments for any amount not in excess of the applicable limit of liability of this policy, all premiums on appeal bonds required in any such defended suit, but without any obligation to apply for or furnish any such bonds;

(c) pay all expenses incurred by the company, all costs taxed against the insured in any such suit and all interest accruing after entry of judgment until the company has paid, tendered or deposited in court such part of such judgment as does not exceed the limit of the company's liability thereon;

(d) pay expenses incurred by the insured for such immediate medical and surgical relief to others as shall be imperative at the time of the accident;

(e) reimburse the insured for all reasonable expenses, other than loss of earnings, incurred at the company's request.

The amounts incurred under this insuring agreement, except settlements of claims and suits, are payable by the company in addition to the applicable limit of liability of this policy.

\*   \*   \*   \*   \*   \*

### Conditions.

\*   \*   \*   \*   \*   \*

3. Definitions (a) Contract. The word "contract" means a warranty of goods or products, or, if in writing, a lease of premises, easement agreement, agreement required by municipal ordinance, sidetrack agreement, or elevator or escalator maintenance agreement.

(b) Automobile. The word "automobile" means a land motor vehicle, trailer or semi-trailer, \* \* \*.

(1) (c) Products Hazard. The term "products hazard" means the handling or use of, the existence of any condition in or a warranty of goods or products manufactured, sold, handled or distributed by the named insured, other than equipment rented to or located for use of others but not sold, if the accident occurs after the insured has relinquished possession thereof to others and away from premises owned, rented or controlled by the insured or on premises for which the classification stated in division (a) of the declarations or in the company's manual excludes any part of the foregoing;

(2) operations, if the accident occurs after such operations have been completed or abandoned at the place of occurrence thereof and away from premises owned, rented or controlled by the insured, except (a) pick-up and delivery, (b) the existence of tools, uninstalled equipment and abandoned or unused materials and (c) operations for which the classification stated in division (a) of the declarations or in the company's manual specifically includes completed operations; provided, operations shall not be deemed incomplete because improperly or defectively performed or because further

operations may be required pursuant to a service or maintenance agreement.

(d) Assault and Battery. Assault and battery shall be deemed an accident unless committed by or at the direction of the insured.

Rider No. 5 provides that the policy was not to apply "to the products hazard as defined in the policy."

The complaint further alleged that "prior to September 5, 1953, Carl N. Svejcar, doing business as Svejcar Construction Company,[1] entered into a contract as the general contractor for certain construction work upon a certain building * * * in Crystal Lake, McHenry County, Illinois, and, as such general contractor, * * * Svejcar employed * * * Aconomy * * * as a subcontractor to construct and weld certain steel beams in said construction work, which employment was evidenced by a contract not in writing, and that after the making of said contract * * * Aconomy * * * entered upon said premises and undertook to do said work as provided by said contract."

The foregoing allegations were admitted by Aconomy's answer.

The following allegation was denied by the answer:

"* * * all of the work provided for in said contract was completed by * * * Aconomy * * * long prior to said 5th day of September, 1953."

As to the allegations that the decedent, John A. Green, had prior to September 5, 1953 entered into a contract with Svejcar to construct and supply certain concrete roofing for said construction work on said building, and to install the same, and that on said date Green was laying concrete slabs over the steel beams "prior thereto installed and constructed by" Aconomy, and while engaged in said work Green fell through the roof and sustained injuries causing his death, and that the fall resulted from "imperfect and negligent construction of the welding and placing of the said steel beams by" Aconomy, the latter's answer neither admitted nor denied, but called for strict proof thereof.

The complaint also alleged that Roy J. Green, as administrator of the estate of John A. Green, deceased, had commenced suit against Aconomy and others charging negligence of Aconomy in the constructing, welding and placing of said steel beams, and asking for damages, and that Aconomy asserted that said policy applied and plaintiff is obliged to defend said suit and pay any judgment entered therein against Aconomy, that plaintiff has declined to assume any liability or obligation in connection therewith, and denies that said policy covers said occurrence or said suit at law, for the reason that the "products and completed operations or work of the defendant," Aconomy, were not covered by said policy and that the alleged occurrence resulted from completed operations and work of said defendant.

Aconomy's answer admitted the commencement of the lawsuit by Roy J. Green, and alleged that it is covered by the policy of insurance and plaintiff is obliged to defend that suit and pay any judgment entered against said defendant, that the work of Aconomy was not completed on September 5, 1953 and therefore defendant is entitled to coverage under the policy, and denied that the occurrence resulted from completed operations or work of Aconomy.

Aconomy's motion for summary judgment was accompanied by three affidavits.

The affidavit of Bartley Walsh, Jr., in part, set forth:

He is president of Aconomy and has full knowledge of the transactions here involved. On behalf of Aconomy he negotiated a verbal agreement with Svejcar for Aconomy to "install certain steel beams, steel angles, bar joints, stair railings, steel roof hatch, steel door, steel toilet stalls and sky light openings and other work in connection with the erection" of said building, which work of in-

---

1. Herein referred to as "Svejcar".

stallation of steel angles started on September 2 and continued on September 3 and 4, 1953 "and on that date was not completed." On September 5, when Green met his death there still remained to be completed on said building:

"(a) The installation of the angle irons on the roof to secure the sky light

"(b) The installation of the hatchway ladder and hatchway

"(c) The installation of the steel partitions and the installation of the sky light and whatever else was to be done under this contract."

The installation of the steel angles continued on September 8 and 10, 1953, and the sky light was completed. The installation of the hatchway ladder and hatchway was done on January 27, 1954, and the final work of installation of the steel railing was completed February 10, 1954 "at which time the entire work required by the certain verbal contract was completed."

Carl Svejcar's affidavit set forth that on or about August 3, 1953 he negotiated a verbal agreement with Bartley Walsh, Jr., president of Aconomy, "for the installation of certain steel beams and other work in connection with the construction of the said Moose Lodge Building," which "was not finally completed until the 10th day of February, 1954."; that on September 5, 1953 "there still remained other work to be done" and "the last of said work under the said contract was not completed until February 10, 1954."

John Vincent Anderson's affidavit set forth that "he was the architect who designed and drew the specifications for the construction of an addition to" said building; that Svejcar was the general contractor who entered into an oral contract with Aconomy "to do certain steel and ornamental iron work on said building"; that pursuant thereto Aconomy "entered upon said building and proceeded to do certain steel and ornamental iron work thereon"; that "following the injury and death of the said John A. Green, and on September 5, 1953, this affiant entered upon said building and made an inspection of all work done and yet to be done, that upon said inspection he found that the following steel and ornamental iron work provided for under the specifications and to be done by the said Aconomy Erectors, Inc.," had not been completed: installation of steel roof hatch, beams to support the same, hatchway ladder, stairway railing, steel toilet partitions, and additional welding in that mid span fillet welds to secure double angle purlins together to form "Tee" section.

In opposition to the motion for summary judgment plaintiff filed the affidavit of Robert E. Harlow, which set forth that he is claim manager of plaintiff in Chicago; that upon receipt on September 11, 1953 of notice of the accident in question, he caused an investigation to be made, including an interview with Bartley Walsh, Jr., who signed a written statement dated September 14, 1953, and that on September 5, 1953 at a coroner's inquest on the body of John A. Green, deceased, Carl Svejcar testified, the transcript of his testimony being annexed to the affidavit. In part, Walsh's signed statement set forth that Aconomy's welding job took about one hundred man hours and was completed prior to September 5, 1953; the roof angles of steel were welded onto steel bar joists; these constituted the steel framework that was to support the roof of the building; its employees did this welding work "at the location of the building;" after the steel structure was complete, other workmen were laying composition blocks on the structure; when they were placed on the tack welded angle, it came loose and John Green, who was putting the block in place, fell 12 feet to the cement floor below; the only way this can be explained is that one of the men missed this particular spot which he should have welded.

Svejcar's testimony was, in part, that he and Green were present when the Aconomy welders started and also when they completed the job.

Plaintiff contends that defendant's affidavits did not properly establish facts entitling it to a summary judgment and that under the pleadings, affidavits and

counter-affidavit, together with the documentary evidence filed in support thereof, there is a genuine issue as to the material facts in this case.

■ 1. Both by their pleadings in the district court and by their briefs in this court, the parties have assumed that the obligation of plaintiff as to the Green accident depends upon whether the work of Aconomy was or was not completed at the time of said accident. If this be the right assumption, we believe that plaintiff is correct in its contention that there is a genuine issue as to the material facts in the case. In 598 Cases, Each Containing 24 Cans, More or Less of Tomatoes v. United States, 7 Cir., 211 F.2d 249, at page 251, we said:

"Factual issues are not to be tried or resolved by summary judgment procedure. Once it is determined that there exists a genuine and material factual issue, summary judgment may not be granted. In making this determination doubts (of course the doubts are not fanciful) are to be resolved against the granting of summary judgment."

It will therefore be necessary to reverse the judgment below.

■■ 2. A careful reading of the policy raises another question which might be controlling in this case. The true meaning of the policy is difficult to determine. An examination of it involves a physical effort of no mean proportions. Starting out with three printed pages, the first of which consists largely of a form which is filled in on a typewriter, the reader is confronted also with six physically attached supplements, or riders, inconveniently assorted into different sizes. If he is possessed of reasonable physical dexterity, coupled with average mental capacity, he may then attempt to integrate and harmonize the dubious meanings to be found in this not inconsiderable package. A confused attempt to set forth an insuring agreement is later assailed by such a bewildering array of exclusions, definitions and conditions, that the result is confounding almost to the point of unintelligibleness. To describe the policy as ambiguous is a substantial understatement. To ascertain its meaning we are forced to seek refuge in the well settled rules that insurance contracts are to be construed liberally in insured's favor and strictly against the insurer, Aschenbrenner v. U. S. Fidelity & Guaranty Co., 292 U.S. 80, 54 S.Ct. 590, 78 L. Ed. 1137; Liverpool & London & Globe Ins. Co. v. Kearney, 180 U.S. 132, 21 S.Ct. 326, 45 L.Ed. 460; and conditions and stipulations in the policy are to be construed most strictly against the insurance company, First Nat. Bank of Kansas City v. Hartford Fire Ins. Co., 95 U.S. 673, 24 L.Ed. 563.

Guided by these rules, it might reasonably be claimed that there emerges through the confusing language and the shapeless masses of words before us, an intention to protect Aconomy from the commonplace risks incidental to the business of a construction contractor. Was that the protection for which Aconomy paid a premium? If it could be deduced that the meaning of the policy is that the building under construction, to the extent that it was controlled by Aconomy in doing its work under contract with Svejcar, was the premises covered by the policy, and the work done there by Aconomy constituted the operations, the hazards of which were insured, it might be seriously contended that Aconomy was and is entitled to the protection of the policy insofar as the Green accident is concerned.

It might be in good faith argued that there were no "products" insured by this policy, because the word "products" was intended to refer to articles made by an insured and offered for sale, and further, that there is therefore no occasion to consider the argument of plaintiff in regard to the definition of "products hazard" contained in the policy, and, for the same reason, the question of whether the operation of Aconomy had been completed at the time of Green's accident, is immaterial.

Inasmuch as plaintiff's contention in regard to the time of completion of Aconomy's operation is based largely upon the

policy's so-called definitions above set forth, it might be urged that the "(c) Products Hazard" provision is divided into two paragraphs, (1) and (2). (1) (c) speaks of an accident occurring after the insured has relinquished possession "thereof" (goods or products) to others and away from the premises owned, rented or controlled by the insured, while (2) (c) refers to an accident occurring after operations have been completed or abandoned at the place of occurrence thereof and away from premises owned, rented or controlled by the insured, with certain exceptions stated. Does the placing of these two paragraphs in the policy under the heading of "Products Hazard", as well as the language of the paragraphs themselves, indicate that the language in question has nothing to do with the case before us because the policy expressly eliminates from coverage "Products (Including Completed Operations)"? The undisputed facts show that the accident to Green resulted from an operation by Aconomy's workmen, and certainly, at the time they performed their work, its contract was in the course of performance. In view of these provisions of the policy can it be said that their acts were a part of the operations covered by the policy and took place on premises likewise covered?

We look upon these questions as material. We express no opinion as to how they should be answered. They have not been raised by counsel. Neither that fact nor the fact that the point was not raised in or passed upon by the district court prevents us from passing upon such questions when they appear from a reading of the record before us. If we were to decide these questions in such a way as to call for an affirmance of the district court, we would have a right so to do. In Reinstine v. Rosenfield, 7 Cir., 111 F.2d 892, at page 894, we said:

> "From time immemorial Courts of Appeal have been authorized to affirm the rulings of lower courts for any valid reason based upon the evidence, although not assigned."

To the same effect see 5 C.J.S., Appeal and Error, § 1464, p. 72 et seq.

However, on these questions we have not the benefit of a decision of the trial court or the views of counsel in this court, and we therefore believe it would be unwise to make a decision based wholly upon our own efforts. Inasmuch as there must be a reversal and remandment for further proceedings, because of our conclusion in paragraph number 1 hereof, we refrain from any further decision herein. Upon a remandment either party may, if desired, by proper procedure raise in the district court the additional questions which we find presented by this record.

We hold that the district court erred in entering a summary judgment against the plaintiff. That judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

FINNEGAN, Circuit Judge.
I concur in the result.